## McKENZIE v. UNITED STATES.
### No. 48999.

United States Court of Claims.

Decided May 1, 1951.

David Morgulas, New York City (M. Carl Levine, Morgulas & Foreman, New York City, on the briefs), for plaintiff.

William A. Stern, II, Washington, D. C., with whom were H. G. Morison, Asst.

Atty. Gen. and Newell A. Clapp, Acting Asst. Atty. Gen. (Paris T. Houston, Washington, D. C., of counsel), for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

The defendant has demurred to the plaintiff's petition on the ground that it does not state facts sufficient to constitute a cause of action and has filed a counterclaim.

Plaintiff, as trustee in bankruptcy for the Graves-Quinn Corporation, brings this action against the United States under the War Contracts Hardship Claims Act, otherwise known as the Lucas Act.[1] Plaintiff's petition and the accompanying exhibits which were made a part thereof, allege that on September 14, 1940, the Graves-Quinn Corporation entered into a lump-sum contract with the United States for the construction of temporary housing facilities at various locations in Massachusetts, Maine, and Rhode Island (Contract No. W6101 qm–131 O. I. No. 66). The contract was duly completed and the work finally accepted by the Government in February 1941. At the conclusion of the contract some 11 claims were submitted by the contractor to the contracting officer, including the claim here in suit of $366,640.20, which claim plaintiff alleges is of the character contemplated by the Lucas Act.[2]

In support of its demurrer, defendant makes two contentions: (1) That the re-

1. Public Law 637, 79th Congress, 2d Session, 60 Stat. 902 amended June 25, 1948, Public Law 773, 80th Congress, 2nd Session, 62 Stat. 869, 41 U.S.C.A. § 106 note.

2. The Lucas Act provides in part as follows:

"That where work, supplies, or services have been furnished between September 16, 1940, and August 14, 1945, under a contract or subcontract, for any department or agency of the Government which prior to the latter date was authorized to enter into contracts and amendments or modifications of contracts under section 201 of the First War Powers Act, 1941 (50 U.S.C., Supp. IV, app., sec. 611), such departments and agencies are hereby authorized, in accordance with regulations to be prescribed by the President within sixty days after the date of approval of this Act, to consider, adjust, and settle equitable claims of contractors, including subcontractors and materialmen performing work or furnishing supplies or services to the contractor or another subcontractor, for losses (not including diminution of anticipated profits) incurred between September 16, 1940, and August 14, 1945, without fault or negligence on their part in the performance of such contracts or subcontracts. Settlement of such claims shall be made or approved in each case by the head of the department or agency concerned or by a central authority therein designated by such head. "Sec. 2. (a) In arriving at a fair and equitable settlement of claims under this Act, the respective departments and agencies shall not allow any amount in excess of the amount of the net loss (less the amount of any relief granted subsequent to the establishment of such loss) on all contracts and subcontracts held by the claimant under which work, supplies, or services were furnished for the Government between September 16, 1940, and August 14, 1945, and shall consider with respect to such contracts and subcontracts (1) action taken under the Renegotiation Act (50 U.S.C., Supp. IV, app., sec. 1191), the Contract Settlement Act of 1944 (41 U.S.C., Supp. IV, secs. 101–125), or similar legislation; (2) relief granted under section 201 of the First War Powers Act, 1941, or otherwise; and (3) relief proposed to be granted by any other department or agency under this Act. Wherever a department or agency considering a claim under this Act finds that losses under any such contract or subcontract affected the computation of the amount of excessive profits determined in a renegotiation agreement or order, and to the extent that the department or agency finds such amount was thereby reduced, claims for such losses shall not be allowed under this Act. "(b) Every claimant under this Act shall furnish to the department or agency concerned any evidence within the possession of such claimant bearing upon the matters referred to in subsection (a) of this section. "Sec. 3. Claims for losses shall not be considered unless filed with the department or agency concerned within six months after the date of approval of this Act, and shall be limited to losses with respect to which a written request for relief was filed with such department or agency on or before August 14, 1945, but a previous settlement under the First War Powers Act, 1941, or the Contract Settlement

quests for equitable relief filed by the contractor with the contracting agency were dated prior to the passage of the First War Powers Act of December 18, 1941,[3] and, therefore, could not have been claims which sought a remedy under that Act; (2) that in any event the request made by the contractor was for an increase in the contract price as a matter of right under the contract and not for the extra-legal relief contemplated by the First War Powers Act and the Lucas Act, citing Fogarty v. United States, decided by the Supreme Court on November 6, 1950.[4]

With respect to the defendant's first contention, it is true that the contractor's original requests for relief with respect to the matter in suit were made prior to the effective date of the First War Powers Act. However, neither the First War Powers Act nor the Lucas Act specifically requires that requests for relief must have been filed *after* December 18, 1941, the date of the passage of the First War Powers Act. The First War Powers Act refers to contracts "heretofore or hereafter made". Executive Order 9001, December 27, 1941, 6 F.R. 6787, 50 U.S.C.A.Appendix, § 611 note, implementing that Act, provides in part: "3. The War Department, the Navy Department, and the United States Maritime Commission may by agreement modify or amend or settle claims under contracts heretofore or hereafter made * * *. Amendments and modifications of contracts may be with or without consideration and may be utilized to accomplish the same things as any original contract could have accomplished hereunder, irrespective of the time or circumstances of the making of or the form of the contract amended or modified, or of the amending or modifying contract, and irrespective of rights which may have accrued under the contract, or the amendments or modifications thereof."

With respect to the Lucas Act, the only requirements regarding the time when the request for relief must have been filed are that the request must have been filed on or

before August 14, 1945, and be with respect to work, supplies, or services furnished between September 16, 1940, and August 14, 1945. The work and services set forth in the contract were furnished by the contractor within the time specified in the Lucas Act and the requests for relief were filed prior to August 14, 1945. In view of the fact that the First War Powers Act specifically contemplated relief under contracts "heretofore made," *i. e.*, prior to December 18, 1941, and the Lucas Act refers to work performed after September 16, 1940, we believe that the contractor's requests for relief dated October 25, 1940, November 11, 1940, and April 18, 1941, attached to plaintiff's petition, relating as they did to work performed after September 16, 1940, were timely and could have been considered under either act unless they were defective in some other respect.

In any event, two further requests for relief are attached to plaintiff's petition with respect to this same matter, which were made subsequent to the passage of the First War Powers Act. On December 30, 1941, the attorneys for the trustee in bankruptcy of the contractor wrote to the Chief of Engineers stating that they had received on behalf of the trustee various claims made by the contractor, including the one now in issue; that they had been directed by the court to continue attempts to make adjustment of those claims; that an appointment was desired with officials in Washington for the purpose of obtaining "just consideration of the claims." On May 12, 1942, the same attorneys wrote to the Secretary of War appealing from the contracting officer's denial of Claim No. 11 (the claim in suit) and Claims Nos. 1 and 4 (in part), asking that a review of the claims be made "to the end that an equitable adjustment may be allowed." The letter further states that the detailed basis of the claims had previously been set forth in full. It is our opinion that these two letters renew the requests previously made and incorporate by reference the matters referred to in the letters written

Act of 1944 shall not operate to preclude further relief otherwise allowable under this Act."

3. 50 U.S.C.A.Appendix, § 611.
4. 340 U.S. 8, 71 S.Ct. 5.

prior to December 18, 1941, so that even under defendant's view of the case these requests were timely.

We now come to defendant's second contention that the relief requested by the contractor was not the sort of extra-legal relief contemplated by the First War Powers Act and held by the Supreme Court in the Fogarty decision to be a prerequisite to relief under the Lucas Act. The Graves-Quinn contract was a lump-sum building construction contract. After the bids were accepted, but prior to the commencement of work thereunder, the Government let a number of cost-plus-a-fixed-fee contracts in the immediate vicinity of the Graves-Quinn project. Because of the "cost-plus" nature of their contracts, these contractors were able to offer employment to local labor with the guarantee of considerable overtime, thus drawing that labor away from Graves-Quinn whose fixed-price contract only permitted a limited amount of overtime pay. The "cost-plus" contractors had a similar advantage in the materials market. In order to meet the competition thus created and to complete its work according to the contract, Graves-Quinn incurred considerable excess labor and material costs over and above the amount contemplated in its bid, and it was for the resulting loss that the contractor requested relief. According to plaintiff's petition, at least two requests for relief from this condition were made during the course of the contract on October 25 and on November 11, 1940. Copies of these letters to Chief of Construction in the Quartermaster General's Office are not attached to the petition,[5] but the decision of the War Contract Hardship Claims Board for the Army (made a part of plaintiff's petition) characterizes these letters as advices to the Chief of Construction that plaintiff was losing money on the contract. In a letter to the War Department dated April 4, 1941 (attached to the petition), after the contract had been completed, Graves-Quinn described the above events and made the following statement with respect to its claim:

"The purpose of this memorandum is not to ask for compensation for the loss which we sustained, in fact the Government has already taken the position that we have no legal claim for this loss. Without agreeing or disagreeing with the Government's position we wish to point out that there must be at least a feeling of moral responsibility to which we now appeal.

"The Graves-Quinn Corporation which was organized in 1927 has been seriously damaged. The Government has received value far in excess for that for which it has paid. The principals of the Graves-Quinn Corporation, namely, Mr. Graves and Mr. Quinn, are men of long experience in the construction field, both of whom have devoted their lifetime to it. Their competency has never been questioned for a moment and is well-known to various Government departments for whom they worked under every type of construction. At the present time they still have intact the organization that was used on the subject contract. Their credit is still good, in fact they have everything with which to carry on their excellent record for performance except their capital which has been dissipated through no fault of theirs and through circumstances which were of the Government's making, possibly this was necessary but the fact remains that the circumstances were created by the Government's policy.

"We think, therefore, that the Government should in an evidence to preserve [sic] this organization and to compensate it for the great loss which it has sustained give serious consideration to awarding the Graves-Quinn Corporation a cost-plus a fixed fee contract. The excellent performance under such difficult circumstances of the contract which resulted in this loss is the best recommendation the Government could have of their ability to carry on and complete according to plans and specifications."

In another letter, dated April 9, 1941 (attached to the petition), the contractor wrote to the Chief of Construction, Quartermaster General's Office, thanking that officer for his letter of commendation, and stating in part as follows: "We have finished a very difficult job under emergency condi-

5. Plaintiff states that it does not have copies of these letters and refers the court to the originals on file with the War Department.

tions in direct competition with two large cost-plus contracts from the War Department and one of similar nature from the Navy Department. Under these conditions it is not possible for the contracting officer to make findings of fact within the framework of the existing contract under the section on disputes, so that some measure of equity may be done the lump-sum contractor, who has suffered by reason of the emergency."

Apparently there was no reply to this letter, and on April 18, 1941, the contractor's attorneys, Spencer & Iserman, wrote to the Secretary of War concerning the losses and stated in part as follows:[6]

"The award of the cost-plus contracts was understandable since the need of speed in national rearmament is of course of tremendous importance, and yet on the other hand we feel that the United States never intended and would not want the lump-sum contractors who were doing the best work they could for the Government to sustain terrific losses which were caused by the action of the Government itself.

"I am advised by various persons connected with the United States Army that they are powerless to grant any relief to the contractors and if any relief is granted it will have to be granted by Act of Congress.

"In view of the above, may I ask you whether or not you would be willing to designate someone to examine into the facts of this situation and if you find the facts as I have outlined them to you, would you be willing to support an Act of Congress to give relief to the lump-sum contractors.

"While this letter is written in behalf of Graves-Quinn Corporation, it represents a situation which is not peculiar to that corporation but also affects many other contractors."[7]

On April 26, 1941, the contracting officer denied the contractor's claim stating that "there is no legal basis for allowing you the extra compensation claimed." On December 30, 1941, the attorneys for the trustee in bankruptcy wrote to the Chief of Engineers with reference to the contractor's claims, including the claim in suit, and asked for a personal interview to go over the matters "before we involve the estate in any expense of litigation." On May 8, 1942, the same attorneys wrote to the Secretary of War reviewing the situation, stating that this claim and others of the contractor had been denied by the contracting officer, and stating, "We respectfully ask that you review the claims to the end that an equitable adjustment may be allowed." The Secretary was also advised that the trustee might wish to submit further data in connection with the claims.

The defendant in its brief in support of its demurrer does not consider or discuss the letters written prior to the passage of the First War Powers Act on December 18, 1941. It is our opinion that those letters requested extra-legal relief. The letters so state, and the nature of the relief requested was certainly extra-legal.[8] The claim now in suit was denied by the contracting officer and the head of the department on the ground that there was no legal or contractual basis for granting relief, and that they had no power to grant any other kind of relief. With respect to the two letters written after the passage of the First War Powers Act, the defendant seeks to find justification for its contention that the relief sought was contractual in the phrase contained in the letter of December 30, 1941, by the trustee's attorneys: "before we involve the estate in any expense of litigation." In this connection we note that the letter had reference not only to Claim No. 11 (the claim in suit) but also to the other claims which had been denied and which were admittedly claims for legal relief under the contract and had also been

---

6. Plaintiff states that it has no copy of this letter and refers the court to the original on file with the War Department.

7. This quotation is taken from the decision of the Army War Contract Hardship Claims Board, which decision is attached to plaintiff's petition.

8. Cf. Standard Accident Insurance Company and Albert E. McKenzie as Trustee, etc. v. United States, 59 F.Supp. 407, 103 Ct.Cl. 607, certiorari denied 326 U.S. 729, 66 S.Ct. 37, 90 L.Ed. 434.

denied. The use of that expression in the context of the letter does not, we think, indicate that the contractor had changed its mind and believed that Claim No. 11 was a legal contract claim or was asserting it as such. In the letter of May 8, 1942, to the Secretary of War, the attorneys again requested an "equitable adjustment" of the claim. We conclude that the requests for relief contained in the letters written before and after the passage of the First War Powers Act, insofar as they relate to this particular claim, were requests for extra-legal relief such as could have been considered under the First War Powers Act.

In the case of Fogarty v. United States, 340 U.S. 8, 71 S.Ct. 5, 8, the contractor's request for relief was in the nature of a claim for progress payments, overtime work, changes in plans and specifications and in wage rates, evidenced by a number of invoices purporting to bill the Navy Department for goods and services, all of which had been previously submitted to agencies of the Navy Department. The Supreme Court held that the documents (the invoices) relied on by the contractor did not come within the meaning of the term "written request for relief" as used in the Lucas Act, since at no time had the contractor sought relief as a matter of grace but rather had sought payment of the invoices as a matter of right and that those invoices constituted a basis for suit in court. The court concludes: "None of the documents relied on by petitioner was sufficient to apprise the Navy Department that it was being asked to accord relief under the First War Powers Act."

Although the First War Powers Act was never mentioned in any of the documents before us by the contractor, the attorneys for the trustee in bankruptcy, or by the Government, we think that the letters attached to plaintiff's petition were sufficient to apprise the Army that it was being asked to accord extra-legal relief to this contractor.

It might be urged by the Government that because the contractor was petitioned into bankruptcy in July of 1941, five months before the passage of the First War Powers Act, and because at the time that Act was passed the contractor had no other contracts with the Government, the trustee's later requests for extra-legal relief could not have been favorably recommended by the Army under the powers granted it by the First War Powers Act for the reason that the Army probably could not have made the requisite finding that the granting of such relief would have facilitated the prosecution of the war. What the Army would have done in that regard is, of course, pure conjecture. We are not called upon to decide what action should have been taken under the powers conferred on the agency by the First War Powers Act, since those powers were entirely discretionary with no right of appeal therefrom. The Lucas Act, under which this claim is brought, does not say that a petitioner under that Act must, in order to recover, prove that he would have been granted relief under the First War Powers Act. Indeed, the Lucas Act was passed because certain agencies, at the end of the war, felt that they could not make the requisite finding regarding the prosecution of the war and, therefore, denied First War Powers Act relief to a number of contractors. As so passed, the Lucas Act gives to war contractors a right of action against the Government where previously they had only a hope, and that right of action is not based on a showing that recovery would facilitate the prosecution of the war. It is based (in that respect) merely on a showing that the agency in question has been placed on notice, prior to August 14, 1945, that the contractor was seeking extra-legal relief, such notice to be evidenced by a written request for the relief. Plaintiff has met this requirement.

On the basis of the pleadings in this action we overrule the defendant's demurrer. With respect to defendant's counterclaim for unpaid Social Security taxes in the amount of $31,030.54, it is noted that the Collector of Internal Revenue for the Third District of New York filed proofs of claim covering such unpaid taxes in the bankruptcy proceeding and that the claims were allowed by the referee but are still unpaid. In view of our decision to overrule defend-

ant's demurrer and to allow the case to be tried on its merits, we shall suspend any action on defendant's counterclaim until final decision in the case.

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER, and LITTLETON, Judges, concur.